## COMMONWEALTH *vs.* JOSE LOPEZ.

Essex. January 9, 2001. - February 22, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, & SOSMAN, JJ.

*Homicide. Practice, Criminal,* Capital case, Loss of evidence by prosecution, Judicial discretion, Witness, New trial. *Evidence,* Rebuttal, Relevancy and materiality.

In a murder case, in which the defendant's truck, an item of material evidence, had inadvertently and without the Commonwealth's knowledge or consent been destroyed, the judge properly denied the defendant's motion to dismiss and related motion in limine to exclude evidence seized from the truck, where the defendant showed no prejudice. [410-412]

At a murder trial, the judge acted properly within his discretion in allowing a late-discovered prosecution witness to testify in rebuttal to the defendant's case after affording defense counsel an opportunity to investigate and examine the witness [413-414]; further, the judge acted properly within his discretion to deny the defendant's request to reopen his case to present sur-rebuttal witnesses [414].

A Superior Court judge correctly denied a motion for new trial, filed by a defendant convicted of murder and based on asserted newly discovered evidence, where the defendant's affidavit in support of the motion was merely self-serving, and where the judge found that the recanting affidavit of a prisoner, who had testified to the defendant's admissions while in pretrial custody, was not credible. [414-416]

INDICTMENTS found and returned in the Superior Court Department on August 17, 1994.

A pretrial motion to dismiss the indictments was considered by *Robert A. Barton,* J.; the cases were tried before him; and a motion for new trial, filed on November 24, 1999, was heard by him.

*Kern Cleven* (*Benjamin D. Entine* with him) for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of kidnapping and murder in the first degree by reason of deliberate premeditation. The victim was the seven year old

son of the defendant's former girl friend. The defendant appeals from the convictions and the denial of his motion for a new trial. We reject his claims that the judge (1) erred in denying the defendant's pretrial motion to dismiss the indictments because the defendant was prejudiced by the Commonwealth's destruction of his truck; (2) abused his discretion in allowing rebuttal testimony by a Commonwealth witness after the defendant had rested his case, and in denying the defendant thereafter the right to present surrebuttal testimony; and (3) improperly denied the defendant's motion for a new trial. We also conclude that there is no basis to exercise our power pursuant to G. L. c. 278, § 33E, to order a new trial or reduce the defendant's murder conviction to a lesser degree of guilt. Accordingly, we affirm the judgments of conviction and the order denying the motion for a new trial.

The background of the case is as follows. The defendant met the victim's mother, Maria Rodriguez, in July, 1993, and began living with her and her two sons shortly thereafter in Haverhill. Rodriguez was a habitual drug user, and the defendant often assisted in caring for the two boys. By April, 1994, the defendant and Rodriguez were experiencing conflict in their relationship, and the defendant threatened to "take the kids away [and] hide them . . . so [she] wouldn't find them." Rodriguez obtained a protective order against the defendant, but he persisted in coming to her apartment. Sometimes she allowed him to come in, and he slept on her couch several nights a week.

On June 28, 1994, Rodriguez was paid $1,000 to enter into a sham marriage with a man who wanted to obtain United States citizenship. Later that day, Rodriguez and the defendant, who was very upset over the marriage, argued over whether she would move away from Haverhill with him. He left Rodriguez's apartment, but returned in the early morning hours of June 29, banging on the door, crying, and asking Rodriguez to take him back. She let him in, and he slept on her couch for the rest of the night.

On the afternoon of June 29, 1994, at approximately 4 P.M., Rodriguez left the defendant in her living room watching television. Her son, the victim, was playing at a neighbor's home, and the defendant agreed to watch the victim while Rodriguez went out. The defendant then went to the apartment where the victim was playing and offered him money to go home to help him close a window. The victim left his friends,

saying that he would be back. A neighbor saw the defendant and the victim get into the defendant's truck and drive away. The neighbor told Rodriguez, after she returned home, that the defendant had taken the victim "in the truck and left."

The defendant returned to Rodriguez's apartment later that evening, without the victim. He told Rodriguez that he had paid the victim five dollars to help him with the window, but denied leaving with the victim in his truck. The defendant and Rodriguez then went to the police station and reported the boy missing.

The next day, the defendant gave several statements to the Haverhill police regarding his whereabouts on the previous evening. The defendant told the police that, on the previous day, at approximately 4:30 P.M., he went to a neighbor's house and offered the victim money to close a window at home. After the victim closed the window, he stated that he was going to return next door to play. The defendant then walked to a friend's house, got his truck, returned to Rodriguez's apartment and parked his truck in the driveway. The defendant stated that, at that time, about 5 P.M., nobody appeared to be at the apartment. The defendant told the police that, after doing an errand, he had gone to the home of a friend, Nancy Valle, with whom he had made an arrangement to pay fifty dollars a month to store clothes in her apartment and to stay occasionally. There, the defendant had changed out of the dirty clothes that he had been wearing.

On the basis of these statements, the police obtained the defendant's written consent to search his pickup truck and to retrieve from Valle's apartment the clothes he had worn the previous day. Police officers subsequently recovered the defendant's wet black pants from Valle's apartment and a number of items from the defendant's truck, including a length of rope. Later that evening, the defendant was arrested on the charge of kidnapping. The defendant's truck was towed to the garage of the Haverhill department of public works (DPW).

On July 8, 1994, eight days after the defendant's arrest and nine days after the victim's disappearance, workers at a salvage yard in Haverhill discovered the victim's body in the trunk of a white Chrysler Cordoba automobile marked to be destroyed by a "crusher." The body was weighted down with a one hundred pound transmission, and a rope was looped around the neck and tied to the trunk hinges.

At trial, the Commonwealth presented substantial evidence of the defendant's guilt. There was testimony that the defendant had been seen at the salvage yard about one and one-half weeks before the victim's body was found. The defendant had been looking for a transmission, and had been directed to an area of the yard near the automobile in which the body was found. There was a section of fence missing from that same area of the yard, and a set of fresh tire marks near the missing fence section. Paint smears taken from a screwdriver found in the defendant's truck matched the paint on the automobile in which the body was found. Fibers consistent with those from the victim's multicolored shorts were found in the defendant's truck, and black fibers consistent with the truck's carpet were found on the victim's sandals. In addition, the defendant's black pants contained stains of iron and rust, white paint chips, and red fibers consistent with those from the victim's hooded shirt. The medical examiner testified that the victim had died approximately one week before his body was discovered, but, because of severe decomposition of, and insect infestation to, the body, it was impossible to determine whether the cause of death was strangulation, the weight of the transmission placed on the body, or the heat inside the trunk of the automobile.

The Commonwealth also presented the testimony of Angel Miranda, the defendant's cellmate while the defendant was held in a house of correction awaiting trial. Miranda testified that the defendant had told him that he had offered the victim ten dollars, driven him to a junkyard, strangled him with a brown towel until he was unconscious, and placed him inside the trunk of a car "marked to be crushed," with a transmission on top of him.

The defendant, whose primary defense was alibi, presented witnesses to testify that he was with them at various times between 2 P.M. and 4:45 P.M. on the afternoon of the victim's disappearance. The defendant also presented witnesses to testify that he loved the victim and his brother, was often their principal caregiver, and had at one time filed neglect petitions against their mother. In addition, he attempted to impeach Miranda's testimony through the testimony of other house of correction inmates who suggested that Miranda may have fabricated the defendant's admission to avenge a beating. The defendant presented a forensic expert who criticized the Commonwealth's failure to perform certain tests on the paint and fiber samples

recovered, and indicated that the tests performed by the Commonwealth were inconclusive.

The defendant also attempted to introduce another suspect for the murder through the testimony of John Roche, who lived on the road abutting the salvage yard. Roche testified that he made contact with the Haverhill police to report a suspicious truck he had seen on his road during the last week of June, 1994. Roche testified that he informed someone at the police department identifying himself as "Sergeant Smith" that there were three people in the truck, a woman and two men, one whom he described as "stocky, bald and Spanish." When the defendant's trial began two years later, and it was apparent that the police had failed to follow up on his information, Roche again made contact with the Haverhill police. A Haverhill police officer testified that the man described by Roche fit the description of a suspected area drug dealer, known as "Kojak," but that Kojak never came up as a suspect during the investigation of the victim's murder. The defendant did not testify in his defense.

After the defendant rested his case, the Commonwealth introduced the testimony of Julia Diaz. She testified that one day in October or November of 1993, a time when the defendant and Rodriguez were having problems in their relationship, the defendant told her that he was not a "sucker," and if Rodriguez left him, he would "hurt [Rodriguez] where it hurts the most." He then told Diaz a story he described as having happened in the Dominican Republic. The defendant stated that a couple there were "having problems," so the man took the woman's children and hid them for a few days, returning them safely only when the couple "got back together."

1. The defendant argues that his pretrial motion to dismiss the indictments should have been allowed. This motion was made following the defendant's discovery that his truck, which had been held at the Haverhill DPW garage since his arrest in June, 1994, had been inadvertently destroyed in March, 1996. The defendant maintains that the truck's destruction, in violation of a court order to preserve it, prevented him from utilizing the truck as a possible source of exculpatory evidence or from effectively impeaching the Commonwealth's evidence. So, the

defendant concludes, the judge was required to dismiss the indictments.[1]

The judge held a hearing and made findings of fact[2] and conclusions of law on the motion. The judge found that, on July 21, 1994, during a search conducted pursuant to a search warrant, the Commonwealth seized the following items from the defendant's truck: two screwdrivers; one hammer; one pocket knife; floor mats; paint, upholstery, and carpet samples; a sample of the rubber seal from the passenger door; and vacuum sweepings. All of the items seized were made available for examination by defense experts. Photographs of each tire of the truck were taken, which showed the tread pattern, and these had also been made available to the defense.

The judge also found that the State police had informed DPW employees that the truck was to be "retained as evidence in a pending criminal case." The truck, nevertheless, was erroneously marked for destruction. On March 20, 1996, without the knowledge or consent of the local or State police, the truck was removed to a junkyard by DPW employees and destroyed.

The judge decided that the Commonwealth had exercised good faith in attempting to preserve the truck, but had been negligent in allowing it to be destroyed. The judge further determined that the defendant had failed to show any loss or destruction of reasonably possible beneficial evidence. On this important issue, the judge reasoned that the samples obtained from the truck (which were available to the defendant for independent testing) were the only evidence that the Commonwealth intended to offer at trial, and there was no showing that the defendant would have found any additional evidence in the truck that might have been material to his defense. The judge noted as well that the truck had been held at the DPW garage for almost two years, and the defendant could have had the vehicle examined during that period if his trial counsel felt that there was a strong possibility of the discovery of exculpa-

---

[1]Simultaneously with his motion to dismiss, the defendant submitted a motion in limine to exclude as evidence in the Commonwealth's case paint, fibers, and rust stains taken from the truck, and all resulting scientific reports and test results, as well as photographs of the tire prints.

[2]The judge's findings were primarily based on a set of stipulated facts that was submitted by the parties. In addition to the stipulated facts, the judge considered all of the testimony received at an earlier hearing on the defendant's motion to suppress his statements and physical evidence.

tory evidence. The judge concluded that there was no discernible prejudice to the defendant due to the negligent destruction of the truck.

"[W]hen potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *DiBenedetto*, 427 Mass. 414, 419 (1998), quoting *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). After the Commonwealth fails to preserve evidence, a defendant may be entitled to relief, if he establishes "a 'reasonable possibility, based on concrete evidence rather than a fertile imagination,' that access to the [lost or destroyed evidence] would have produced evidence favorable to his cause." *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984), quoting *State* v. *Michener*, 25 Or. App. 523, 532 (1976). The Commonwealth failed in its responsibility to preserve the truck. The defendant, however, is entitled to no remedial action because we are unpersuaded of the reasonable possibility that the truck may have contained material evidence that would have supported his claim of innocence.

There was more than adequate opportunity for the defendant to inspect and conduct independent tests on samples and on the tools taken from the truck by the Commonwealth. Cf. *Commonwealth* v. *Gliniewicz*, 398 Mass. 744, 748 (1986) (boots partially destroyed by testing so that comparable testing by defendants not possible). Photographs of the truck's tires were also available to the defendant. See *Commonwealth* v. *Hunter*, 426 Mass. 715, 718-719 (1998) (destruction of fingerprint not prejudicial when defendant had been furnished with photographs of print). Considering that the defendant, while represented by counsel, had access to the truck for over one and one-half years before it was destroyed (and, so far as the defendant was aware, for almost two years, yet, apparently, he had conducted no independent examination of the vehicle during that time), there is no basis to credit the defendant's claim that the truck's destruction prevented him from possibly discovering exculpatory evidence.[3] The defendant has shown no prejudice. The judge properly denied his motion to dismiss and his related motion in limine to exclude evidence.

---

[3]We reject the defendant's specific assertion that he was prejudiced because he was prevented from matching paint from the truck with paint found on

2. (a) On the fourth day of trial (the second day of testimony), the Commonwealth moved to present a late-discovered witness, Julia Diaz, whose testimony has been summarized above. Diaz had first made contact with the police five days earlier. Although promptly notified, the defendant's trial counsel had been unable to coordinate with his investigator to interview Diaz in the intervening time. The judge ruled that the Commonwealth could not present Diaz as a witness in its case-in-chief, but that he would consider a prosecution motion to have Diaz testify in rebuttal, thereby "afford[ing] defense counsel an adequate opportunity to do whatever investigation [concerning Diaz that] has to be done." Nine days later, the judge allowed the Commonwealth to call Diaz as a rebuttal witness over an objection by the defendant's trial counsel that her testimony, as a rebuttal witness, concerned matters that were too remote, and not responsive, to the issues that had been raised by the defense. Rejecting these contentions, the judge noted that he had originally disallowed Diaz's testimony solely because of its late discovery that required time for the defendant's trial counsel to investigate, examine, and prepare to counter her evidence.

While the defendant characterizes Diaz's testimony as improper rebuttal evidence, the foremost issue, as correctly stated by the judge, was one of timing. Because Diaz was late in making herself known to the prosecution, the defendant was entitled to have time to investigate her testimony in order to make preparations to cross-examine her. The judge's ruling granted the defendant's trial counsel that opportunity. In allowing Diaz's testimony, the judge also properly rejected the defendant's contentions that her testimony was too remote from events in issue, was otherwise not relevant, or did not rebut the defendant's case. Diaz's testimony not only contradicted testimony in the defendant's case about his cordial relationship with, and quasi parental affection for, Rodriguez's children, but also indirectly linked the defendant to the kidnapping and murder. The judge acted well within the broad discretion conferred on trial judges to arrange the schedule of a trial to accommodate witness testimony, in order to resolve the needs and rights of the parties; to decide questions of relevance and remoteness of evidence; and to decide whether to allow rebuttal

tools removed from the truck. The defendant stipulated to the fact that the Commonwealth preserved a sample of the truck's silver paint, and this sample was made available to the defendant.

testimony. See *Commonwealth* v. *Rosenthal*, 432 Mass. 124, 129 (2000); *Commonwealth* v. *McLaughlin*, 431 Mass. 241, 248 (2000). See also *Commonwealth* v. *Roberts*, *ante* 45, 51 (2000).[4]

(b) The judge similarly acted within his discretion to deny the defendant's request to reopen his case to present surrebuttal witnesses to counteract Diaz's testimony. Specifically, the defendant proposed calling a State trooper to testify that Rodriguez had told him that her problems with the defendant commenced only a few months before the victim's disappearance, and a defense investigator to testify that Diaz had told him that Rodriguez had a "party attitude" after the victim's death. The judge properly concluded that the proffered evidence was "cumulative and collateral in nature"[5] and of "highly doubtful relevance."[6] See *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 664-665 (1979); *Commonwealth* v. *Blaikie*, 375 Mass. 601, 610-611 (1978); *Commonwealth* v. *Almon*, 30 Mass. App. Ct. 721, 726 (1991). The judge's indication that the defendant, if he chose (which he did not), could take the stand to rebut Diaz's testimony was appropriate to the circumstances. The judge's ruling did not violate the defendant's right to a fair trial.[7] See *Commonwealth* v. *Durning*, 406 Mass. 485, 495 (1990); *Blaikie* v. *Callahan*, 691 F.2d 64, 68 (1st Cir. 1982).

3. The defendant's motion for a new trial was based on allegedly newly discovered evidence. Two types of evidence were

---

[4]The judge properly instructed the jury that they should consider Diaz's testimony with relation to the defendant's "knowledge, intent, motive, or method." He was not required to instruct, as the defendant now suggests, that the testimony had limited rebuttal value.

[5]Rodriguez had testified that her problems with the defendant started in April, 1994.

[6]The defendant misstates that, at trial, "Diaz . . . denied having said that Maria Rodriguez was in a 'party mood' after [the victim's] death." Diaz denied that Rodriguez had been "in a party" with her, and never answered defense counsel's question concerning whether Rodriguez was in a "party mood" after the victim's disappearance. This colloquy between defense counsel and Diaz was as follows:

DEFENSE COUNSEL: "After the disappearance of [the victim], Maria was in a party mood, wasn't she?"

THE WITNESS: "In a party with me?"

DEFENSE COUNSEL: "Yes."

THE WITNESS: "No."

[7]We also reject the defendant's contention that the judge's ruling placed "an additional burden on [the defendant's] Fifth Amendment right not to be compelled to testify."

involved in the motion. The first concerned "Kojak," who, it will be recalled, was the alternate suspect vaguely identified at trial in the testimony of the defense witness, John Roche. In the affidavits supporting the motion for a new trial, the defendant claimed that he had acquired more (and previously undiscoverable) information about Kojak. The defendant purportedly learned that Kojak's name was Juan Garcia, that Garcia had convictions of distributing a controlled substance, assault and battery, and threatening to commit a crime, and that Garcia had also been arrested and charged with numerous crimes that had been dismissed. The defendant concluded from this information that Garcia was known to the Haverhill police. A retired Haverhill police officer also stated, by affidavit, that Kojak was known to have been involved in an "automotive business." The defendant obtained a photograph of Garcia and showed it to John Roche, who identified Kojak as the man he had seen in the truck. When the defendant saw the photograph, he identified Kojak as a person who had supplied Rodriguez with drugs, had been involved romantically with one of her sisters, and had vowed to have revenge against the defendant after a fight between the two men. A defense investigator also discovered that, at the time Roche called the Haverhill police department to report his sighting of Kojak, there was an Officer Smith employed there who sometimes served as dispatcher (where presumably he would have taken Roche's call). The defendant asserted that this evidence was newly discovered and material because it was in the nature of exculpatory evidence within the knowledge and possession of the Commonwealth that had been wrongfully withheld from him.

The second type of allegedly newly discovered evidence was a posttrial recantation by Angel Miranda of his testimony that the defendant had, while in pretrial custody, admitted to killing the victim. Miranda asserted in his affidavit that he had fabricated his testimony because he was angry with the defendant, who had beaten him and assisted others in assaulting him. An affidavit by a second inmate, who had been Miranda's cellmate while Miranda was incarcerated, was offered to support Miranda's recantation.

The judge denied the motion for a new trial without a hearing with the following indorsement: "Based on the affidavits filed [with the motion] and the fact that I was the trial judge, I find that the [defendant's] 'newly discovered evidence' does not cre-

ate a substantial risk that, [if] the jury [were] exposed to [the Garcia-Kojak] evidence, [they] would have reached a different conclusion. I [also] do not credit the recantation by the witness, Angel Miranda. His testimony under oath at the trial, was . . . impeached by . . . defense witnesses . . . . Justice was done."

(a) The judge's skepticism (and rejection) of the Kojak information was justified. There is no evidence that Juan Garcia was involved in the victim's murder. The witness, John Roche, never was able to pinpoint the dates of his purported observations. The only evidence directly connecting Garcia to the defendant, or to the Rodriguez family, came in the defendant's own self-serving affidavit. The usefulness of this information is highly questionable; the defendant did not testify at the trial, and his claim that Garcia threatened revenge against him is impermissible hearsay. Allegations about Garcia's criminal history add nothing of substance to the defendant's claim.

Merely introducing another possible suspect, without substantial admissible evidence that this person, and not the defendant, may have committed the crimes, does not warrant a new trial. Here, the possibility of Garcia as an alternate suspect was presented to some extent at trial, and rejected by the jury. The little additional and generalized information contained in the defendant's postconviction affidavits casts no real doubt on the validity of the jury's verdicts.[8] See *Commonwealth* v. *Wolinski*, 431 Mass. 228, 234-238 (2000); *Commonwealth* v. *Randolph*, 415 Mass. 364, 368 (1993).

(b) The judge's rejection of Angel Miranda's affidavit expressing recantation needs little discussion. The judge heard Miranda's testimony at trial, and the judge was in a position to determine whether Miranda's subsequent change in testimony was credible. The judge's finding that the recantation was not believable is final. See *Commonwealth* v. *Leate*, 361 Mass. 347, 349-350 (1972).

4. There is no merit to the defendant's argument that his conviction of murder in the first degree should be reduced under

---

[8]This conclusion essentially moots the defendant's contentions that the alleged new information about Kojak was not previously available because the police failed to preserve it, and that the defendant was prejudiced thereby. See *Commonwealth* v. *Stote, ante* 19, 22 (2000); *Commonwealth* v. *Willie,* 400 Mass. 427, 432-434 (1998). We note, however, that these contentions have no adequately supportable basis in the record.

G. L. c. 278, § 33E, to a conviction of manslaughter. There was strong evidence that the defendant lured the victim to a predesignated, isolated place, strangled him, and then locked him in the trunk of an automobile under the weight of a one hundred pound transmission, either dead or soon to die. The jury's verdict of murder in the first degree was warranted by the evidence and consonant with the heinous nature of the crime.

5. The judgments are affirmed. The order denying the defendant's motion for a new trial is affirmed.

*So ordered.*