## COMMONWEALTH *vs.* EMILIO CASTRO.

Suffolk. October 11, 2002. - November 21, 2002.

Present: MARSHALL, C.J., GREANEY, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Evidence,* Exculpatory, Relevancy and materiality, Police report, Hearsay, Identification, Impeachment of credibility. *Due Process of Law,* Disclosure of evidence. *Practice, Criminal,* Disclosure of evidence, Loss of evidence by prosecution, Argument by prosecutor, Waiver, Instructions to jury, Assistance of counsel, Capital case. *Identification. Witness,* Impeachment. *Waiver. Constitutional Law,* Assistance of counsel.

At a murder trial, the judge correctly denied the defendant's motions for required findings of not guilty of murder in the first degree, where the evidence was sufficient to prove beyond a reasonable doubt that the defendant was the person who shot the victim, and that he acted with deliberate premeditation and with the intent to murder. [164-166]

At a criminal trial, the defendant was not denied his due process rights to a fair trial by the prosecutor's failure to disclose in a timely fashion certain exculpatory and material evidence, where the defendant failed to demonstrate that he had suffered any adverse consequences from the prosecutor's delay in making the disclosure [166-169]; further, the judge did not abuse his discretion in excluding certain of the exculpatory evidence, which was hearsay; moreover, even if arguably admissible, the exclusion of the evidence was not prejudicial because the evidence was also inculpatory [169].

At a criminal trial, the judge did not err in failing to declare a mistrial based on an alleged irremediably tainted in-court identification, where the record amply supported the judge's conclusion that the Commonwealth had satisfied its burden of demonstrating by clear and convincing evidence that the in-court identification had an independent source. [169-172]

A criminal defendant was not denied a fair trial and was not prejudiced by the prosecutor's loss of exculpatory evidence. [172-173]

At a murder trial, the judge acted within his discretion in denying the defendant's motion for a mistrial after the medical examiner improperly testified that the victim's death was a homicide, where the challenged testimony was inconsequential in light of the defendant's never having denied that someone had killed the victim and the defendant's defense of misidentification, and where the judge immediately instructed the jury to disregard the challenged testimony. [173]

At a murder trial, the judge did not abuse his discretion in refusing to allow the defendant's trial counsel to impeach the victim's brother during his cross-examination on pending unrelated Federal charges against him, where there was no evidence that the brother was expecting to be released from Federal custody in return for his testimony in the defendant's trial. [173-174]

At a criminal trial, there was no error in the judge's not holding a colloquy to determine whether the defendant was voluntarily waiving his right to testify, where the judge had informed the defendant that he had an "absolute" right to choose either to testify or not to testify, and that the decision was his to make, and where the defendant also had had the opportunity to discuss the matter with his trial counsel. [174]

At a criminal trial, the defendant was not prejudiced by the prosecutor's allegedly impermissible consciousness of guilt argument, where the prosecutor's remarks were isolated and were adequately cured by the judge. [175]

There was no merit to the contention by a defendant charged with murder that, by repeating the phrase "the defendant" in his charge to the jury, the judge inferred that the defendant was the "doer of the crimes"; or that the judge told the jury that there was no evidence to substantiate a claim of manslaughter. [175]

This court concluded that a criminal defendant's trial counsel provided constitutionally adequate representation, and remitted any deeper examination of the defendant's ineffective assistance of counsel claims to a motion for a new trial. [175-176]

INDICTMENTS found and returned in the Superior Court Department on April 3, 1997.

The cases were tried before *Stephen E. Neel*, J.

*Chrystal A. Murray* for the defendant.

*Alex G. Philipson*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. Based on a shooting that occurred at an apartment in the Jamaica Plain section of Boston, a jury in the Superior Court convicted the defendant of deliberately premeditated murder in the first degree of Luis Bautista, armed assault with intent to murder Shirley Suarez, unlawful possession of a firearm, and unlawful possession of ammunition.[1] Represented by new counsel on appeal, the defendant argues that (1) a new trial is warranted because he was denied a fair trial by the prosecutor's failure timely to disclose exculpatory and material evidence; (2) he was "irreparably prejudiced" by the judge's failure to declare a mistrial based on an alleged irremediably tainted in-court identification; and (3) he was deprived of his constitutional right to effective assistance of trial counsel. The defendant, in his own pro se brief, repeats some of

[1]The defendant's conviction of unlawful possession of ammunition was placed on file with his consent and is not before us on appeal. See *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975).

the arguments advanced by his appellate counsel and advances several additional arguments.[2] We reject all claims of error. We also discern no basis, pursuant to G. L. c. 278, § 33E, to reduce the verdict of the jury on the murder charge or to order a new trial. We affirm the judgments of convictions.

Based on the Commonwealth's evidence, the jury could have found as follows. On the evening of October 9, 1996, Suarez went to a restaurant with her friend Rosemary Sanchez. The defendant, whom Suarez had met previously, joined the women at a table, then returned to the bar. Suarez asked the defendant for a ride home to change her clothes. He obliged, and they thereafter returned to the restaurant.

Back at the restaurant, Suarez joined Sanchez and three other friends: Bautista, his brother Juan Bautista (also known as "Men" and as Vidal DeJesus),[3] and a man known as Rene. When the restaurant closed at 2 A.M., the group went to Suarez's apartment at 106 Minden Street, in the Jamaica Plain section of Boston. The defendant was not invited.

A little while later the defendant arrived at Suarez's apartment. He knocked on one of the living room windows. Suarez peered through the window's blinds. The defendant asked if he could come in. Suarez told him no. The defendant then rang the doorbell and knocked on the door. One of the men opened the door. Suarez said the defendant was not welcome. The defendant then tried to force his way inside.

A scuffle ensued. Rene and the defendant began fighting outside. Juan retrieved a metal rod from his trunk and used it to hit the defendant. The defendant left on foot, although he had parked his beige-gold Honda Accord automobile nearby. Juan noticed that the defendant's car was parked behind his car and that there was some damage to his car, so he wrote down the vehicle's registration number.

At about 2:30 A.M., Juan and Rene left the apartment. About fifteen minutes later, Suarez heard knocking on one of her living room windows. She peered through the blinds, but could only see a shadow. She turned off the living room light and,

---

[2]We need not separately address the same arguments made by the defendant and by his appellate counsel.

[3]We shall refer to Juan Bautista by his first name.

with Bautista, joined Sanchez in the bathroom. Shortly thereafter, Suarez and Bautista returned to the living room. Suarez again heard knocking on the window. She looked through the blinds and saw the defendant outside on the other side of the window; she saw only his face. Suarez was able clearly to see the defendant because the lights inside her apartment had been turned off and because it was well lit outside. Suarez did not see anyone else. She intended to lift the entire blind to speak to the defendant, but then felt a bullet hit her chest. She ran toward the bathroom. As she ran, she saw Bautista getting up from a couch and heard two more shots. Bautista died later that morning from a gunshot wound to his chest.

After learning of his brother's death, Juan reported the registration number of the defendant's car to the police. Several days later, an arrest warrant and criminal complaint issued against the defendant. About one year later, in September, 1997, the defendant was stopped by police for a traffic violation in Indianapolis, Indiana. The defendant gave a false name to police, who towed his car because he did not have a driver's license. Indianapolis police later learned that the car was wanted in connection with a murder in Boston and they notified Boston police.

More than one year later, Indianapolis police apprehended the defendant, who was using an alias. The police had learned from Jorge Henriquez, the defendant's neighbor, that the defendant previously had been involved in a shooting in Boston. The defendant had told Henriquez that he had once been involved in a fight with some Dominican men in Boston, that he left the fight and then returned with a gun, and that he had fired through a window of the house where the people were staying, killing one man and injuring a woman. The defendant was extradited to Boston.

The defendant did not testify. His defense was misidentification and we summarize here the evidence relevant to that defense claim: that Suarez had not seen the shooter, and that the shooter was some unidentified black or Hispanic man. The following testimony supported his defense. On cross-examination, a Boston detective testified that shortly after the shooting, Sanchez told him that before the shooting she saw through the windows of the apartment the defendant and a black man wear-

ing black jeans and a black leather jacket. Another officer testified during cross-examination that during his interview of Suarez days following the shooting, she told him that when the defendant had been fighting with Juan, the defendant said that he would be back with more people, and that she (Suarez) heard Sanchez say, before the shooting, that there was a black man outside the apartment.

The defendant's private investigator testified that, based on a photograph showing the gunshot holes through the window and blinds, the blinds "were down" when the shots were fired. The investigator also explained the tests he conducted on similar blinds, which were closed and through which he shot, to replicate the damage done to the blinds at Suarez's apartment.

Sanchez testified that about twenty minutes after the defendant's altercation with Juan, the defendant returned with a black man in a black leather jacket. She saw the black man standing next to one of the apartment's windows. The defendant stood next to him and knocked on one of the windows, then began ringing the doorbell. About five minutes later, Sanchez retreated to the bathroom. She then noticed that the lights in the apartment had been turned off and then, almost simultaneously, heard shots.

The defendant's sister, Elbia Castro, testified that the defendant drove two cars, a beige Honda Accord and a blue car that he used for making deliveries for the restaurant for which he worked. Elbia testified that on the day of the shooting two men showed up at the restaurant (she also worked there) with a weapon looking for the defendant. Elbia called the defendant to warn him. The next time she saw her brother was three years later, when he returned from Indiana. Dell Leathers, a woman who lived in an apartment above Suarez, testified that on each of the three nights prior to the shooting, she saw a Hispanic man banging on the doors and windows of Suarez's apartment. She also testified that she had never seen the defendant before.

1. *Sufficiency of the evidence.* The judge denied the defendant's motions for required findings of not guilty presented at the close of the Commonwealth's case, and again at the close of all the evidence. The defendant argues that these motions should have been allowed because the evidence was insufficient to

prove beyond a reasonable doubt that the defendant was the shooter, or that he acted with deliberate premeditation or with the intent to murder. We conclude that there was sufficient evidence to support the jury's verdict, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), and that the Commonwealth's position as to proof did not deteriorate, see *Commonwealth* v. *Basch*, 386 Mass. 620, 622 & n.2 (1982).

The jury reasonably could have inferred from the evidence that the defendant was the shooter. Just seconds before being shot, Suarez saw the defendant (and no one else), whom she had previously met, through the window through which three of the four shots had been fired. See *Commonwealth* v. *Barnoski*, 418 Mass. 523, 540-541 (1994). In addition, the defendant admitted to Henriquez, his neighbor in Indiana, that he had committed the crime. Cf. *Commonwealth* v. *Allison*, 434 Mass. 670, 676 (2001). There was also evidence from which the jury could have inferred consciousness of guilt (including evidence that the defendant fled from Massachusetts to Indiana following the shooting and assumed a different name there).

There was sufficient evidence for a jury to determine that the defendant acted with deliberately premeditated malice aforethought and with the requisite intent to kill. There was evidence that the defendant had a motive to commit the crimes, revenge for repeatedly having been refused entry into Suarez's apartment and for having been beaten by Juan just about one-half hour before the shooting occurred. The defendant left the scene after the physical scuffle with Juan, stating he would be back. As he promised, the defendant did return. Inferentially, he returned armed and, after drawing the persons inside Suarez's apartment closer to the window by knocking on the window, fired four shots, three through the window and one at the door. See *Commonwealth* v. *Williams*, 422 Mass. 111, 122-123 (1996); *Commonwealth* v. *Parker*, 389 Mass. 27, 30 n.2 (1983). That the defendant may have intended to shoot Juan (or Rene), in retaliation for the physical altercation, but his shots into a darkened apartment hit Bautista and Suarez instead (Juan and Rene having left the apartment before the defendant returned), is not of any consequence. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 344-345 n.5 (2001), quoting *Commonwealth* v. *Pitts*,

403 Mass. 665, 669 (1989) ("[t]o find murder based on a theory of transferred intent, the jury need only find that the defendant 'intended to kill one person and, in the course of an attempt to do so, killed another' ").

2. *Disclosure of exculpatory and material evidence.* On the day of the shooting, Officer Carlos Lara of the Boston police department interviewed a witness and made the following report:

> "One of the residents who wishes to keep herself anonymous stated that while at her [apartment] looking out the window, she observed a blue [motor vehicle,] possibly a Honda Prelude, being occupied by two [Hispanic] males, park on Minden St. in the wrong direction facing Walden St., near a street cleaning sign located on Minden St.
>
> "After [the motor vehicle] was parked, she observed the two [Hispanic] males exit the [motor vehicle], one wearing a grey jacket with a hat and both suspects walked to 106 Minden Street speaking in Spanish. A little while later she heard [four] rapidly fired shots, and then observed the two males, run from 106 Minden St. across to the odd numbered side of the street, then run on the side-walk towards the Blue Honda, with the suspect wearing the grey jacket carrying the hand gun in hand.
>
> "Both suspects then entered the [motor vehicle]. The suspect carrying the gun entered the [motor vehicle] through the driver's side and the second suspect entered through the passenger's side. They stayed inside the [motor vehicle] for a short while, then fled on Minden St., turned left on Walden St. in the direction of Heath Street, prior to police arrival."

The report was not brought to the prosecutor's attention until two weeks before trial. As soon as the prosecutor received the report, he sent a copy to the defendant's trial counsel, who moved for a continuance or, in the alternative, for a dismissal of the charges. The defendant argued that the report was exculpatory because it suggested that there were two perpetrators present at the shooting, and because it indicated that the car in which the two perpetrators escaped was not the defendant's

beige-gold Honda Accord. The defendant claimed that the late production of the report did not afford him sufficient time to locate the anonymous witness, and to prepare his defense.

The day before the trial commenced, the judge conducted a voir dire of Officer Lara, who testified that after the prosecution was given the report, an assistant district attorney asked him to find the anonymous witness. Officer Lara went to the building where he had interviewed the witness and learned that her first name was Tina, and that she had moved two years ago to the Academy Homes development.[4] The judge agreed that Tina would be a relevant defense witness, but declined to grant a continuance or dismiss the cases. He stated that the defense had the two weeks prior to trial, and the time during trial, to try to locate Tina.

After the Commonwealth rested, the defendant's trial counsel informed the judge that he had learned Tina's full name, but had not been able to find her. The defendant's trial counsel again argued for the dismissal of the charges against the defendant or a continuance, and argued that the judge declare a mistrial. The judge denied these requests, over objection, finding that Tina's alleged statements were somewhat cumulative of evidence developed in cross-examination of the Commonwealth's witnesses regarding the presence of a second person, and that it would be cumulative of evidence that the defendant intended to present in his case.

Before the defense rested, the defendant's trial counsel asked that either he or Officer Lara be allowed to read Officer Lara's report to the jury. The judge denied the defendant's trial counsel's request over his objection.

The defendant argues that he is entitled to a new trial because (1) his due process rights were violated by the prosecutor's late disclosure of Tina's statements made to Officer Lara; and (2) the judge committed reversible error by excluding Tina's statements contained in Officer Lara's report.

"Ordinarily, due process requires that the prosecution make timely disclosure to a defendant of exculpatory material evidence in its possession." *Commonwealth* v. *Gregory*, 401

---

[4]The defendant did not learn of this information until the voir dire.

Mass. 437, 441 (1988), and cases cited. Exculpatory evidence includes "evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Id.* at 442, quoting *Commonwealth* v. *Ellison*, 376 Mass. 1, 22 (1978). "Undisclosed exculpatory evidence is 'material' if, 'evaluated in the context of the entire record,' it 'creates a reasonable doubt that did not otherwise exist.' " *Commonwealth* v. *Gregory*, *supra*, quoting *United States* v. *Agurs*, 427 U.S. 97, 112 (1976). "When a defendant makes a specific request for reasonably identified evidence, the evidence is deemed material even if it only provides 'a substantial basis for claiming materiality exists.' " *Commonwealth* v. *Gregory*, *supra*, quoting *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 20 (1987). "[W]here a specific request has been made, the appropriate question is whether, given a timely disclosure, the defense would have been able to prepare and present its case in such a manner as to create 'a substantial basis for claiming materiality exists.' " *Commonwealth* v. *Gregory*, *supra*, quoting *Commonwealth* v. *Gallarelli*, *supra*.

The Commonwealth does not contest the fact that the defendant made a specific request for the evidence, Tina's statements, or that the substance of the statements has exculpatory and material features. Rather, the Commonwealth argues that "nothing in the record shows that, had the Commonwealth disclosed Tina's statements in a more timely manner, Tina could have been located and called to testify at trial." We agree. It is a matter of speculation whether more timely disclosure would have allowed the defense to locate Tina,[5] and whether, having located her, her testimony would have aided the defense.[6] In addition, nothing in the record suggests that Tina would be

---

[5]Because of the defendant's flight and use of an alias, he was not apprehended until two and one-half years after the shooting. The request for this evidence and "timely" disclosure thereof would have meant disclosure at or about three years after the shooting.

[6]The Commonwealth wisely avoids advancing any such arguments, and the judge erroneously characterized Tina's alleged statements as cumulative of other evidence. Sanchez placed an unidentified black man outside the apart-

available to testify at a new trial if one were ordered. As in *Commonwealth* v. *Gregory, supra* at 443, the defendant has "failed to demonstrate that [he has] suffered any adverse consequences from the Commonwealth's delay in disclosing evidence."

The defendant contends that the judge committed prejudicial error by preventing a reading of Tina's statements at the trial. He argues that her statements, as contained in Officer Lara's report, were reliable because she was a disinterested witness, she gave a statement to police within hours of the incident, and some of the details in her statements were readily verifiable (such as the fact that there were four gunshots). Thus, the defendant argues that Officer Lara's report was circumstantially trustworthy and should have been admitted under the rule that hearsay evidence may be admitted "to show that a third party might have committed the crime for which the defendant is being tried provided the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other 'substantial connecting links' to the crime." *Commonwealth* v. *O'Brien*, 432 Mass. 578, 588 (2000), and cases cited.

The judge did not abuse his discretion in excluding the report. Tina's statements in the report were nothing more than hearsay. There was no evidence to justify admission of the report under *Commonwealth* v. *O'Brien, supra,* or *Commonwealth* v. *Rosa,* 422 Mass. 18, 23 (1996). Further, even if the report could be considered arguably admissible, there was no prejudice because Tina's statements were also inculpatory. See note 6, *supra.*

3. *In-court identification.* During the trial, Suarez testified

---

ment, but before the shooting. Leathers, Suarez's neighbor, placed an unidentified Hispanic man outside the apartment, but not on the day of the shooting. The statements attributed to Tina consist of the only potential evidence placing a Hispanic man, other than the defendant, outside the apartment just prior to and after the shooting. We note, however, Tina's statements are also *inculpatory.* She allegedly saw two Hispanic men, one of which could have been the defendant, as he was Hispanic (no one testified as to the defendant's attire, and articles of clothing that Tina saw on one of the men could have been removed). Also, Tina allegedly saw the men arrive and flee in a blue motor vehicle, possibly a Honda Prelude. This testimony could be considered inculpatory because there was testimony from the defendant's sister that, in addition to his beige-gold Honda Accord (which he had left at the scene following the original altercation), the defendant also drove a blue car to make deliveries for his employer.

and made an in-court identification of the defendant. Prior to the commencement of her trial testimony, Suarez testified at a voir dire.[7] The following day, before Suarez's trial testimony resumed, the prosecutor informed the judge that he had learned that, just before Suarez had testified at the voir dire, she had seen the defendant, shackled and manacled, in a court house hallway.[8] The prosecutor immediately notified the defendant's trial counsel, who moved for a mistrial on the ground that Suarez's in-court identification had been impermissibly tainted as a result of the hallway encounter.

The judge conducted several voir dire examinations on the issue. The judge questioned, and permitted counsel to question, the police officers who escorted Suarez to the court room, the court officers who transported the defendant out of the court room and into the hallway, and the defendant's sister, Elbia, who was in the hallway at the time of the encounter. The judge also took a view following Elbia's testimony to permit Elbia to indicate where she had been seated in the hallway when she witnessed the encounter.

One of the police officers who had witnessed the encounter, Sergeant Robert Merner, testified as follows.[9] He and another officer kept Suarez "upstairs" until they were informed that Suarez was going to be called soon to testify. When so informed, they waited with Suarez at a bench "tucked" around a corner in a hall leading to the hall outside the court room. A court officer told them they had one or two minutes. Shortly thereafter, another court officer called for Suarez. The police officers then brought Suarez to a back door to the court room, where they were informed that the court officers were not ready. The officers brought Suarez to a corner outside the court room with two

---

[7] The voir dire of Suarez was conducted in response to the defendant's motion to prohibit Suarez from making an in-court identification of the defendant. The judge denied that motion, and the defendant does not appeal from that ruling.

[8] The prosecutor was not informed of the encounter until after court had adjourned.

[9] It is not necessary to summarize the testimony of the other police officer or the testimony of the court officers. Their testimony, which was credited by the judge, described nothing other than an accidental encounter between Suarez and the defendant.

sets of benches. While waiting there, the defendant was led out of the court room through a back door by two court officers and transported to and through another door. Sergeant Merner saw the defendant from a side view for about three seconds. Suarez looked in the defendant's direction and asked Sergeant Merner, "Is that him?" Sergeant Merner gave no response but led Suarez around a corner out of the view of the defendant. At the end of the day, Sergeant Merner gave Suarez a ride home and asked her whether she had seen the defendant in the hallway. Suarez said she had seen the right side of someone but could not see his face.

The defendant's sister, Elbia, testified, essentially, that the court officers had arranged, by signaling to one another by hand, for Suarez to see the defendant as he left the court room.

The judge found that Suarez had seen the defendant's profile for, at most, a few seconds from a distance of about ninety feet, and that the encounter "was absolutely and clearly an accidental, nonintentional event." He further found, relying on, and crediting, Suarez's testimony at her voir dire, that Suarez had "an ample basis for identifying the defendant." The judge explained, "[Suarez] had seen the defendant [fifteen or sixteen times] before October of 1996. She described the occasions on which she spoke with the defendant, rode in a car with him. He was back to her apartment for a period of time, all before the shooting but within a week of the shooting." On that basis, the judge denied the defendant's motion for a mistrial. The defendant's trial counsel objected.

The defendant correctly argues that the admissibility of an alleged tainted identification does not "turn on whether government agents had a hand in causing the confrontation." See *Commonwealth* v. *Jones*, 423 Mass. 99, 109 (1996). However, contrary to the defendant's contention, even assuming an unduly suggestive pretrial confrontation, the record amply supports the judge's conclusion that the Commonwealth had satisfied its burden of demonstrating by clear and convincing evidence that Suarez's in-court identification had an independent source. See *Commonwealth* v. *Odware*, 429 Mass. 231, 235 (1999); *Commonwealth* v. *Johnson*, 420 Mass. 458, 463-464 (1995). As explained by the judge, Suarez had seen the defendant many

times before the shooting at various nightclubs and restaurants. On October 6, 1996, just days before the shooting, Suarez saw the defendant, and was introduced to him and conversed with him, at her birthday party at her apartment. On the night of the shooting, Suarez spoke with the defendant at the restaurant, left there alone with him to drive back to her apartment to change her clothes, and accompanied him back to the restaurant. Later, Suarez saw the defendant knocking at the window to her apartment, witnessed part of the defendant's altercation with her male guests (Juan and Rene), and then clearly observed the defendant's face outside her apartment windows in a well-lit area just seconds before she was shot. Thus, the judge properly denied the defendant's motion for a mistrial. That Suarez had seen the defendant, prior to the shooting, while in a dimly lit and crowded nightclub, or in her crowded apartment, and while she had been drinking alcohol, went to the weight, and not to the admissibility, of the identification, and was for the jury to assess. See *Commonwealth* v. *Odware*, *supra* at 236.

4. *Lost evidence.* We reject the defendant's claims that he was denied a fair trial and was prejudiced by the prosecutor's loss of exculpatory evidence consisting of the window and window blinds of Suarez's apartment, and the car he was driving in Indiana, his beige-gold Honda Accord, that was impounded and later auctioned by Indianapolis police. "[W]hen potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Lopez*, 433 Mass. 406, 412 (2001), quoting *Commonwealth* v. *DiBenedetto*, 427 Mass. 414, 419 (1998). "After the Commonwealth fails to preserve evidence, a defendant may be entitled to relief, if he establishes, 'a "reasonable possibility, based on concrete evidence rather than a fertile imagination" that access to the [lost or destroyed evidence] would have produced evidence favorable to his cause.' " *Commonwealth* v. *Lopez*, *supra*, quoting *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984). With respect to the windows and window blinds, that evidence was lost when the homicide unit moved to new headquarters and the

defendant does not argue that the police acted in bad faith. Although better care should have been taken to preserve that evidence, the defendant has shown no prejudice from the loss. The evidence was depicted in photographs and his expert used the photographs to show that the blinds "were down" when the shots were fired. This evidence called into question Suarez's testimony that she had looked through the blinds, and had seen the defendant through the blinds seconds before the shooting.

The defendant states that the failure of the police to preserve his car prevented him from pursuing "his claim that the automobile observed at the scene of the crime was dark, or blue in color." The defendant admits that his wife unsuccessfully attempted to retrieve the vehicle. Thus, the vehicle had been available for some period of time before it was auctioned. Recognizing that the defendant had access to this vehicle before it was sold, there can be no basis to credit his claim that the loss of the vehicle prevented him from discovering potentially exculpatory evidence. See *Commonwealth* v. *Lopez, supra.*

5. *Testimony of medical examiner.* The defendant argues that the judge erroneously denied his motion for a mistrial after the medical examiner improperly testified that Bautista's death was a homicide. The judge acted within his discretion. See *Commonwealth* v. *Maldonado*, 429 Mass. 502, 506-507 (1999). Essentially, the challenged testimony was inconsequential in light of the fact that the defendant never denied that someone killed Bautista or that Bautista died from a gunshot wound to the chest, and in light of the defendant's defense of misidentification. See *Commonwealth* v. *Coleman*, 366 Mass. 705, 711 (1975). Also, the judge immediately instructed the jury to disregard the challenged testimony and instructed them that it was their duty to decide whether a homicide had occurred, and if so, whether the Commonwealth had proved beyond a reasonable doubt that the defendant was the person who had committed it.

6. *Impeachment evidence.* The defendant argues that the judge abused his discretion in refusing to allow the defendant's trial counsel to impeach Juan during his cross-examination on pending unrelated Federal charges against him. There was no abuse of discretion. *Commonwealth* v. *Sleeper*, 435 Mass. 581, 606

(2002); *Commonwealth* v. *Purcell*, 423 Mass. 880, 884 (1996). Based on the prosecutor's representations and Juan's testimony on the issue at a voir dire, there had been no communication between the Commonwealth and Federal authorities concerning Juan's pending Federal charges, and Juan did not expect to be released from Federal custody in return for his testimony in the defendant's trial. See *Commonwealth* v. *Sleeper*, *supra* at 605-606; *Commonwealth* v. *Purcell*, *supra* at 883-884.

There is no basis to the defendant's argument that Suarez "should have [been] allowed to be cross-examined to impeach [her] testimony and to the fact [that she] could not identify the defendant." The defendant's trial counsel did cross-examine Suarez on the identification issue, calling into question, for example, whether her identification was compromised by her consumption of alcoholic beverages before the shooting. To the extent that the defendant challenges the scope and content of that cross-examination, he presents those issues in his claim of ineffective assistance of trial counsel that we address below.

7. *Waiver of right to testify.* The defendant states that he wanted to testify on his own behalf at trial but was not permitted to do so. He argues that the judge never held a colloquy to determine whether he was voluntarily waiving his right to testify.

During the trial, the defendant's trial counsel informed the judge that he had spent "months" talking to the defendant about whether he wanted to testify at trial. He made various requests for use of a court interpreter to continue to speak with the defendant about that decision. Before the defense rested, the defendant's trial counsel asked the judge to "inquire on the record" as to whether the defendant wished to testify, and whether the decision to testify or not to testify was his own. The judge conducted a voir dire examination of the defendant outside the jury's presence. The judge informed the defendant that he had an "absolute" right to choose either to testify or not to testify, and that the decision was his to make. The judge also confirmed that the defendant had had an opportunity to discuss the matter with his trial counsel, and was advised by his trial counsel of the "various risks and benefits" of testifying or not testifying. There was no error. See *Commonwealth* v. *DeMinico*, 408 Mass. 230, 242 (1990).

8. *Prosecutor's closing argument.* Toward the end of his clos-
ing argument, the prosecutor stated, "Innocent men don't lie,
ladies and gentlemen. Innocent men don't flee . . . [don't] deny
their very identity over and over again." The defendant moved
for a mistrial on the ground that the prosecutor improperly
argued consciousness of guilt to the jury. The judge denied the
defendant's motion over his objection. The defendant argues
that he was prejudiced by the prosecutor's impermissible
consciousness of guilt argument and that the judge's curative
instruction did not cure the problem.

There was no prejudice to the defendant. The remarks were
isolated and were adequately cured. After the remarks had been
made and the judge had denied the defendant's motion for a
mistrial, the judge immediately instructed the jury that the
prosecutor's remarks were contrary to law and that innocent
people sometimes do the things the prosecutor mentioned (lie,
flee, deny their identity). See *Commonwealth v. Toney*, 385
Mass. 575, 585-586 n.6 (1982). He also properly cautioned the
jury that "evidence of so-called consciousness of guilt is never
enough, by itself, to convict a person of a crime." See *id.* at
585. Further, in his final instructions to the jury, the judge fully
and properly repeated the limitations of the use of conscious-
ness of guilt evidence. See *id.*

9. *Jury instructions.* There is no merit to the defendant's
contention that, by repeating the phrase "the defendant" in his
charge to the jury, the judge "lulled the jury into the belief that
the defendant was the doer of the crimes." The judge made it
clear to the jury that the Commonwealth bore the burden of
proving identification of the defendant as the perpetrator of the
crimes alleged beyond a reasonable doubt. There was no error.
Cf. *Commonwealth* v. *Santoli*, 424 Mass. 837, 845 (1997); *Com-
monwealth* v. *Cuffie*, 414 Mass. 632, 640-641 (1993) (Appendix).

There is also no merit to the defendant's contention that the
judge told the jury that there was no evidence to substantiate a
claim of manslaughter. On the contrary, the judge instructed on
involuntary manslaughter, as well as murder in the first and
second degrees.

10. *Effective assistance of trial counsel.* The defendant argues
that he was deprived of his constitutional right to effective as-

sistance of trial counsel because his trial counsel failed to impeach Suarez on her testimony that she saw the defendant outside her window just before the shots were fired, failed to impeach Suarez with her grand jury testimony, and for no tactical reason, "actively enhanced" Suarez's testimony on the identification issue. He also argues that his trial counsel failed to explore on cross-examination of certain witnesses discrepancies bearing on his identification, failed to call witnesses to impeach Suarez's testimony, failed to pursue a diminished capacity defense, and failed adequately to communicate with him and "cost the defendant his right to testify." On the record before us, it appears that the defendant's trial counsel provided constitutionally adequate representation, and we remit any deeper examination of the claims to a motion for a new trial. See *Gibney* v. *Commonwealth*, 375 Mass. 146, 148 (1978), and cases cited; *Commonwealth* v. *McCormick*, 48 Mass. App. Ct. 106, 107 (1999).

11. *Review under G. L. c. 278, § 33E.* There is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or to direct entry of a lesser degree of guilt on the murder conviction.

*Judgments affirmed.*