**Jose LOPEZ, Petitioner,**

v.

**COMMONWEALTH OF MASSACHU-SETTS, and Page True, Warden, Sussex State Prison Respondents.**

**No. CIV.A.01–11207–WGY.**

United States District Court,
D. Massachusetts.

Dec. 3, 2004.

Benjamin D. Entine, Attorney at Law, Boston, MA, for Jose Lopez, Plaintiff.

Dean A. Mazzone, Attorney General's Office, Boston, MA, for Commonwealth of Massachusetts, Respondent.

Linda A. Wagner, Attorney General's Office, Boston, MA, for Commonwealth of Massachusetts, Respondent.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

Jose Lopez (Lopez) has filed a petition for a federal writ of habeas corpus, alleging that the Massachusetts courts violated his federal constitutional rights to due process and a fair trial, and against compelled self-incrimination, by failing to suppress certain evidence at his trial (and dismiss his indictment on those grounds) or to award him a new trial based on newly discovered evidence. Although Lopez's claims regarding evidentiary rulings at trial fail under 28 U.S.C. § 2254(d), his claims regarding his motion for a new trial have sufficient merit to warrant granting him an evidentiary hearing to determine whether the writ of habeas corpus ought issue.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

As the Court explains below, the Supreme Judicial Court's ("SJC") factual findings must be treated as correct here because the SJC's findings as to what evidence Lopez and the Commonwealth produced at trial, and the conclusions the SJC draws from that evidence, fall within the reasonable range. The Court therefore quotes verbatim the SJC's findings as to the factual background:

The background of the case is as follows. [Lopez] met the victim's mother, Maria Rodriguez, in July, 1993, and began living with her and her two sons shortly thereafter in Haverhill. Rodriguez was a habitual drug user, and [Lopez] often assisted in caring for the two boys. By April, 1994, [Lopez] and Rodriguez were experiencing conflict in their relationship, and [Lopez] threatened to "take the kids away [and] hide them ... so [she] wouldn't find them." Rodriguez obtained a protective order against [Lopez], but he persisted in coming to her apartment. Sometimes she allowed him to come in, and he slept on her couch several nights a week.

On June 28, 1994, Rodriguez was paid $1,000 to enter into a sham marriage with a man who wanted to obtain United States citizenship. Later that day, Rodriguez and [Lopez], who was very upset over the marriage, argued over whether she would move away from Haverhill with him. He left Rodriguez's apartment, but returned in the early morning hours of June 29, banging on the door, crying, and asking Rodriguez to take

him back. She let him in, and he slept on her couch for the rest of the night.

On the afternoon of June 29, 1994, at approximately 4 P.M., Rodriguez left [Lopez] in her living room watching television. Her son, the victim, was playing at a neighbor's home, and [Lopez] agreed to watch the victim while Rodriguez went out. [Lopez] then went to the apartment where the victim was playing and offered him money to go home to help him close a window. The victim left his friends, saying that he would be back. A neighbor saw [Lopez] and the victim get into [Lopez]'s truck and drive away. The neighbor told Rodriguez, after she returned home, that [Lopez] had taken the victim "in the truck and left."

[Lopez] returned to Rodriguez's apartment later that evening, without the victim. He told Rodriguez that he had paid the victim five dollars to help him with the window, but denied leaving with the victim in his truck. [Lopez] and Rodriguez then went to the police station and reported the boy missing.

The next day, [Lopez] gave several statements to the Haverhill police regarding his whereabouts on the previous evening. [Lopez] told the police that, on the previous day, at approximately 4:30 P.M., he went to a neighbor's house and offered the victim money to close a window at home. After the victim closed the window, he stated that he was going to return next door to play. [Lopez] then walked to a friend's house, got his truck, returned to Rodriguez's apartment and parked his truck in the driveway. [Lopez] stated that, at that time, about 5 P.M., nobody appeared to be at the apartment. [Lopez] told the police that, after doing an errand, he had gone to the home of a friend, Nancy Valle, with whom he had made an arrangement to pay fifty dollars a month to store

clothes in her apartment and to stay occasionally. There, [Lopez] had changed out of the dirty clothes that he had been wearing.

On the basis of these statements, the police obtained [Lopez]'s written consent to search his pickup truck and to retrieve from Valle's apartment the clothes he had worn the previous day. Police officers subsequently recovered [Lopez]'s wet black pants from Valle's apartment and a number of items from [Lopez]'s truck, including a length of rope. Later that evening, [Lopez] was arrested on the charge of kidnapping. [Lopez]'s truck was towed to the garage of the Haverhill department of public works (DPW).

On July 8, 1994, eight days after [Lopez]'s arrest and nine days after the victim's disappearance, workers at a salvage yard in Haverhill discovered the victim's body in the trunk of a white Chrysler Cordoba automobile marked to be destroyed by a "crusher." The body was weighted down with a one hundred pound transmission, and a rope was looped around the neck and tied to the trunk hinges.

At trial, the Commonwealth presented substantial evidence of [Lopez's] guilt. There was testimony that [Lopez] had been seen at the salvage yard about one and one-half weeks before the victim's body was found. [Lopez] had been looking for a transmission, and had been directed to an area of the yard near the automobile in which the body was found. There was a section of fence missing from that same area of the yard, and a set of fresh tire marks near the missing fence section. Paint smears taken from a screwdriver found in [Lopez's] truck matched the paint on the automobile in which the body was found. Fibers consistent with those from the victim's mul-

ticolored shorts were found in [Lopez's] truck, and black fibers consistent with the truck's carpet were found on the victim's sandals. In addition, [Lopez's] black pants contained stains of iron and rust, white paint chips, and red fibers consistent with those from the victim's hooded shirt. The medical examiner testified that the victim had died approximately one week before his body was discovered, but, because of severe decomposition of, and insect infestation to, the body, it was impossible to determine whether the cause of death was strangulation, the weight of the transmission placed on the body, or the heat inside the trunk of the automobile.

The Commonwealth also presented the testimony of Angel Miranda, [Lopez's] cellmate while [Lopez] was held in a house of correction awaiting trial. Miranda testified that [Lopez] had told him that he had offered the victim ten dollars, driven him to a junkyard, strangled him with a brown towel until he was unconscious, and placed him inside the trunk of a car "marked to be crushed," with a transmission on top of him.

[Lopez], whose primary defense was alibi, presented witnesses to testify that he was with them at various times between 2 P.M. and 4:45 P.M. on the afternoon of the victim's disappearance. [Lopez] also presented witnesses to testify that he loved the victim and his brother, was often their principal caregiver, and had at one time filed neglect petitions against their mother. In addition, he attempted to impeach Miranda's testimony through the testimony of other house of correction inmates who suggested that Miranda may have fabricated [Lopez's] admission to avenge a beating. [Lopez] presented a forensic expert who criticized the Commonwealth's failure to perform certain tests on the paint and fiber samples recov-

ered, and indicated that the tests performed by the Commonwealth were inconclusive.

[Lopez] also attempted to introduce another suspect for the murder through the testimony of John Roche, who lived on the road abutting the salvage yard. Roche testified that he made contact with the Haverhill police to report a suspicious truck he had seen on his road during the last week of June, 1994. Roche testified that he informed someone at the police department identifying himself as "Sergeant Smith" that there were three people in the truck, a woman and two men, one whom he described as "stocky, bald and Spanish." When [Lopez's] trial began two years later, and it was apparent that the police had failed to follow up on his information, Roche again made contact with the Haverhill police. A Haverhill police officer testified that the man described by Roche fit the description of a suspected area drug dealer, known as "Kojak," but that Kojak never came up as a suspect during the investigation of the victim's murder. [Lopez] did not testify in his defense.

After [Lopez] rested his case, the Commonwealth introduced the testimony of Julia Diaz. She testified that one day in October or November of 1993, a time when [Lopez] and Rodriguez were having problems in their relationship, [Lopez] told her that he was not a "sucker," and if Rodriguez left him, he would "hurt [Rodriguez] where it hurts the most." He then told Diaz a story he described as having happened in the Dominican Republic. [Lopez] stated that a couple there were "having problems," so the man took the woman's children and hid them for a few days, returning them safely only when the couple "got back together."

*Commonwealth v. Lopez,* 433 Mass. 406, 407–10, 742 N.E.2d 1067 (2001).

The Court notes that the first time Roche saw Kojak, the latter's truck pulled into and out of the driveways on either side of Roche's house before continuing on to the salvage yard. Tr. 15:132–34. The second time Roche saw Kojak, the Sunday after the victim disappeared, Kojak was standing in the street near the Rodriguez residence. *Id.* at 15:135–36.

## A. Lopez's Evidentiary Objections at Trial

### 1. Lopez's Truck

Lopez moved to have forensic evidence taken from his truck suppressed and to have the indictment against him dismissed because the Commonwealth destroyed the truck before trial. In particular, Lopez sought to suppress "paint, fibers, and rust stains taken from the truck, and all resulting scientific reports and test results, as well as photographs of the [truck's] tire prints." *Lopez,* 433 Mass. at 411 n. 1, 742 N.E.2d 1067. The trial court conducted a hearing and made findings of fact and conclusions of law. *Id.* at 411, 742 N.E.2d 1067. The trial judge determined, based on a set of stipulated facts and on testimony at an earlier hearing, that on July 21, 1994, during a search of Lopez's truck conducted pursuant to a valid warrant, the Commonwealth seized various items from the truck and took photographs of each of the truck's tires. *Id.* at 411 & n. 2, 742 N.E.2d 1067. All of this was made available to the defense. *Id.* at 411, 742 N.E.2d 1067. The State police told employees of the Haverhill Department of Public Works garage that was holding the truck to preserve it as "evidence in a pending criminal case," but the truck was "erroneously marked for destruction," and was "de-

stroyed" on March 20, 1996, "without the knowledge or consent of the local or State police." *Id.* at 410–11, 742 N.E.2d 1067. The SJC apparently approved all these findings. *See id.* at 412, 742 N.E.2d 1067.

The trial judge held that "the Commonwealth had exercised good faith in attempting to preserve the truck, but had been negligent in allowing it to be destroyed." *Id.* at 411, 742 N.E.2d 1067. Lopez, however, "had failed to show any loss or destruction of reasonably possible beneficial evidence." *Id.* Because the samples (which were available to Lopez) were the only evidence the Commonwealth sought to use, and because Lopez had had one and a half years to examine the truck for exculpatory evidence before it was destroyed, the trial judge held that Lopez had failed to demonstrate any "discernible prejudice." The SJC upheld the trial judge's findings and conclusions. *Id.* at 412, 742 N.E.2d 1067.

## B. Diaz's Testimony

On the fourth day of the trial, the Commonwealth sought to present Julia Diaz, a late-discovered witness, "who had first made contact with the police five days earlier," and who would testify about Lopez's Dominican Republic kidnaping story. *Id.* at 413, 742 N.E.2d 1067. In order to afford Lopez's attorney a chance to investigate the witness, the trial judge refused to allow her to testify as part of the prosecution's case-in-chief, but stated he would consider a motion to allow her as a rebuttal witness. *Id.* The judge later allowed that motion, over Lopez's objection that her testimony concerned matters "too remote, and not responsive" to the case the defense had presented. *Id.* Although the judge treated Diaz as a rebuttal witness for evidentiary purposes,[1] the SJC held

---

1. The judge properly instructed the jury that Diaz's testimony should only be considered in

that the judge "correctly stated" that "the foremost issue . . . was one of timing." *Id.* In other words, Diaz was an appropriate witness for the case-in-chief, and was only relegated to the rebuttal stage to give Lopez an opportunity to investigate her. *Id.* Moreover, she was an appropriate rebuttal witness, as her testimony "contradicted testimony in [Lopez's] case about his cordial relationship with, and quasi parental affection for, Rodriguez's children." *Id.*

The SJC also held that the trial judge properly refused Lopez's request to present surrebuttal witnesses, on grounds that their testimony would be "cumulative and collateral in nature" and of "highly doubtful relevance." *Id.* at 414, 742 N.E.2d 1067.[2] In the SJC's view, the trial judge's statement to Lopez that he was free to "take the stand to rebut Diaz's testimony" (which he did not) was "appropriate to the circumstances," and not a violation of Lopez's right against compelled self-incrimination under the United States Constitution and the Massachusetts Constitution. *See id.* at 414 & n. 7, 742 N.E.2d 1067.

### C. Lopez's Motion for a New Trial

After Lopez was convicted, he sought a new trial based on two types of newly discovered evidence. *Id.* at 414–15, 742 N.E.2d 1067. The first involved "Kojak," "the alternate suspect vaguely identified at trial" by Roche. *Id.* at 415, 742 N.E.2d 1067. Lopez alleged via affidavit that, after trial, he learned that "Kojak" was in fact Juan Garcia, a man with prior "convictions [for] distributing a controlled substance, assault and battery, and threaten-

ing to commit a crime," and who "had also been arrested and charged with numerous crimes that had been dismissed." *Id.* Lopez concluded that Garcia was "known to Haverhill police," and a retired Haverhill police officer has stated in an affidavit "that Kojak was known to have been involved in an 'automotive business.' " *Id.* Based on a photograph of Garcia, Roche "identified [him] as the man he had seen in the truck." *Id.* Lopez identified Garcia as Rodriguez's drug dealer, and stated that Garcia had been romantically involved with Rodriguez's sister, "and had vowed to have revenge against" Lopez after the two fought on one occasion. *Id.* A defense investigation revealed that there was an Officer Smith working, presumably as dispatcher as he occasionally had served in the past, at the time Roche called the police, and Lopez argued that this meant that Roche's statements to the police constituted "exculpatory evidence within the knowledge and possession of the Commonwealth that had been wrongfully withheld from him." *Id.*

The second type of evidence was a post-trial recanting by Angel Miranda of his testimony that Lopez had "confessed" to him. *Id.* Miranda's affidavit asserts that he lied because he was angry at Lopez for beating him and for helping others assault him. *Id.* A second inmate offered an affidavit supporting Miranda's recantation. *Id.*

The trial judge denied the motion for a new trial without a hearing, and said:

> Based on the affidavits filed [with the motion] and the fact that I was the trial

---

relation to Lopez's "knowledge, intent, motive, or method." *Lopez,* 433 Mass. at 414 n. 4, 742 N.E.2d 1067.

**2.** Lopez sought to present a State trooper to testify that Rodriguez told him that her problems with Lopez did not begin until a few

months before the victim's disappearance (well after Lopez allegedly told his story to Diaz), and a defense expert to testify that Diaz had told him that Rodriguez had a " 'party attitude' after the victim's death." *Id.* at 414, 742 N.E.2d 1067.

judge, I find that the [defendant's] 'newly discovered evidence' does not create a substantial risk that, [if] the jury [were] exposed to [the Garcia Kojak] evidence, [they] would have reached a different conclusion. I [also] do not credit the recantation by the witness, Angel Miranda. His testimony under oath at the trial was ... impeached by ... defense witnesses.... Justice was done.

*Id.* at 415–16, 742 N.E.2d 1067 (alterations in original).

The SJC held that the trial judge's decision was justified. *Id.* at 416, 742 N.E.2d 1067. In particular, with regard to Garcia, the SJC stated that "[t]here is no evidence that Juan Garcia was involved in the victim's murder ... [and t]he only evidence directly connecting Garcia to [Lopez], or to the Rodriguez family, came in [Lopez's] own self-serving affidavit." *Id.* Moreover, "[t]he usefulness of this information is highly questionable; [Lopez] did not testify at the trial, and his claim that Garcia threatened revenge against him is impermissible hearsay." *Id.* Lastly, "the possibility of Garcia as an alternate suspect was presented to some extent at trial, and rejected by the jury." *Id.*

In a footnote, the SJC stated that, in concluding that Lopez's post-conviction affidavits did not cast doubt on the jury's verdict, it had rendered "moot [Lopez's] contentions that the alleged new information about Kojak was not previously available because the police failed to preserve it, and that [Lopez] was prejudiced thereby." *Id.* at 1075 n. 8. The SJC further stated: "We note, however, that these contentions have no adequately supportable basis in the record." *Id.*

As for Miranda's recantation, the SJC stated that "[t]he judge's finding that the recantation was not believable is final." *Id.* at 1075.

### D. Lopez's Habeas Petition

Having preserved his federal constitutional arguments and exhausted state remedies with regard to the relevant claims, Lopez filed a petition for a federal writ of habeas corpus on August 31, 2001, and filed an amended petition, deleting nonexhausted claims, on November 5, 2002. The parties came before this Court for a hearing on October 23, 2003, and the Court took the matter under advisement.

## II. DISCUSSION

### A. Standard of Review

This petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, so the Court's review is governed by that statute. *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

The standard of review in federal collateral challenges to state court convictions became more deferential with the passage of the AEDPA. *See Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J.). State Court factual findings are presumed to be correct, unless the habeas petitioner rebuts that presumption with clear and convincing evidence of error. 28 U.S.C. § 2254(e)(1); *Norton v. Spencer,* 351 F.3d 1 (1st Cir.2003) (holding that this applies equally to state trial and appellate courts); *see Sumner v. Mata,* 455 U.S. 591, 593, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (same, under former statutory habeas regime). Lopez's petition can only be granted if his trial and subsequent state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), or "resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]," *id.* § 2254(d)(2).

The proper interpretation of section 2254(d) was laid out in Justice O'Connor's opinion in *Williams*, which constituted the opinion of the court with respect to that question. A state court decision is "contrary to" Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams*, 529 U.S. at 405, 120 S.Ct. 1495 (O'Connor, J.), or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Id.* at 406, 120 S.Ct. 1495.

▮▮▮ Outside such circumstances, the state court's decision, though not "contrary to" Supreme Court precedent, may be an "unreasonable application" of such precedent to the facts. Such an "unreasonable application" would occur if (1) the state court identified the correct rule from the Supreme Court's cases but unreasonably applied it to the facts before it, or (2) if the state court applied the governing rule to a new situation where it should not apply or, conversely, failed to apply the governing rule in a new situation where it should apply. *See id.* at 407–08, 120 S.Ct. 1495 (stating that this interpretive framework, as laid out in *Green v. French*, 143 F.3d 865 (4th Cir.1998), was "generally correct," but leaving for another day resolution of the exact standard for over— and under-extension cases). A court must refuse to grant the habeas petition if the state court's application of the governing rule to

the facts, though incorrect in the court's view, was not "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495. At the same time, it is not the case that, in order for an application to be objectively unreasonable, the facts must be such that all reasonable jurists would apply the law differently. *Id.* (faulting the *Green* Court for applying such an overly strict standard). Thus, unreasonableness requires "some increment of incorrectness beyond error.... The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir.2002) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (citation and internal quotation marks omitted)).

## B. Lopez's Evidentiary Claims

### 1. Lopez's Truck

▮▮▮ Lopez is not entitled to relief on this claim. The respondents (the "Commonwealth")[3] correctly state that, for purposes of federal habeas review, it is not enough for Lopez to establish (as he attempts to do in his petition) that admission of the forensic evidence from the truck violated his *state* constitutional rights: he must establish that it violated his *federal* constitutional rights. That he cannot do. Under *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), when the government fails "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," *id.* at 57, 109 S.Ct. 333, no violation of the federal Constitution's due process guarantees occurs "unless a criminal defendant can

---

**3.** Both the Commonwealth and Page True, Warden of the Sussex State Prison, are named respondents. The Commonwealth has not raised any issue regarding the proper

respondent, so the Court does not address whether the Commonwealth should remain in the case. In this case, the question obviously is a purely technical one and of no moment.

show" that the government acted in "bad faith." *Id.* at 58, 109 S.Ct. 333. Lopez cites *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to urge that the Commonwealth's good faith is irrelevant, but that case applies to withholding or destruction of exculpatory evidence, not to situations covered by *Youngblood. See Williams,* 529 U.S. at 57, 120 S.Ct. 1114.

### 2. Diaz's Testimony and Lopez's Proposed Surrebuttal

■ Lopez does not make any effort to find cases that suggest that allowing the late-disclosed Diaz to testify violated his *federal* constitutional rights, nor could he. *Cf. United States v. Quesada–Bonilla,* 952 F.2d 597, 602–603 (1st Cir.1991) (holding that the district court did not abuse its discretion in allowing the government's late-disclosed witness to testify). The SJC was within bounds, factually and legally, in its February 22, 2001 decision, in holding that Diaz's testimony would be admissible whether regarded as rebuttal or as case-in-chief evidence, and that the trial judge acted within his discretion in allowing her testimony.

■ Lopez has a slightly stronger argument that the trial court's refusal to allow his surrebuttal evidence violated his Sixth Amendment[4] rights to a fair trial, but this claim fails as well. The SJC reasonably applied *Blaikie v. Callahan,* 691 F.2d 64, 68 (1st Cir.1982), which this Court must treat as correctly interpreting the Supreme Court's Sixth Amendment precedents.

■■ The Sixth Amendment protects the right of criminal defendants to call witnesses in their defense, *Washington v.*

*Texas,* 388 U.S. 14, 18, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), but that protection is not unlimited, *United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) ("[A] defendant's right to present relevant evidence is ... subject to reasonable restrictions"). A defendant's interest in presenting relevant evidence "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer,* 523 U.S. at 308, 118 S.Ct. 1261 (quoting *Rock v. Arkansas,* 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)). It is an interesting question whether Lopez's proposed surrebuttal should be treated as part of his case-in-chief, rather than as rebuttal, given that the trial judge in many ways regarded Diaz as a case-in-chief witness displaced in time. Even taking that approach, however, this Court cannot hold that the trial court's evidentiary rulings were objectively unreasonable, much less that the SJC's finding that no prejudice resulted was erroneous.

### 3. Failure To Preserve or Disclose Notes Taken During Roche's First Interview with the Haverhill Police Department, and Other Information Relating to "Kojak"

■ Under *Brady,* the evidence regarding "Kojak" is sufficient to justify holding an evidentiary hearing. Unlike

---

4. Reference to the Fifth and Sixth Amendments is for the sake of convenience; obviously the rights implicated come under the Four-

teenth Amendment's incorporation of those amendments as against state governments.

the evidence of destruction of the truck, the Commonwealth's failure to preserve or disclose notes taken during Roche's first interview with the police, as well as other information in the police department's possession regarding Garcia, must be evaluated under *Brady*, not *Youngblood,* because such evidence is unquestionably favorable to Lopez. Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. The duty to disclose applies even if the accused has made no request. *See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The *Brady* rule also encompasses evidence "known only to police investigators and not to the prosecutor." *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

 A "true *Brady* violation" has three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Lopez must therefore demonstrate that "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281, 119 S.Ct. 1936; *see Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 (defining evidence as "material" if there is a "reasonable probability" that disclosure would

have led to a different "result" in the proceeding). Under the "reasonable probability" standard, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555.

 This is not an inquiry into the sufficiency of the evidence. The dissent in *Kyles* urged that habeas relief should not have been granted, because even if the exculpatory evidence had been admitted, there still would have been sufficient evidence to support a conviction. *Kyles,* 514 U.S. at 460–71, 115 S.Ct. 1555 (Scalia, J., dissenting). The majority explicitly rejected this analysis. *Id.* at 434–35 & n. 8, 115 S.Ct. 1555 (Souter, J.). Moreover, courts must analyze the "cumulative effect" of undisclosed evidence in determining whether a "reasonable probability" exists that the nondisclosure would have produced a different verdict, rather than evaluating each piece of evidence individually for materiality. *Id.* at 436, 115 S.Ct. 1555.

 The information regarding Roche's first interview with the police should have been disclosed to Lopez. Although it is true that, under *Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case,"[5] if Kojak and Garcia were the same person, and if Lopez's claims about Garcia's grudge against him and relationship with Rodriguez and her

---

5. *See also Bagley,* 473 U.S. at 675, 105 S.Ct. 3375 (due process does not require the prosecutor "to deliver his entire file to defense counsel, but only to disclose evidence favor-

able to the accused that, if suppressed, would deprive the defendant of a fair trial") (citations omitted).

sister are true, then the Roche interview information may well be material under *Bagley*.

The Commonwealth argues (as the state courts did), that there was insufficient evidence to make Garcia a plausible suspect. The Commonwealth cites *Kiley v. United States*, 260 F.Supp.2d 248, 273 (D.Mass. 2003) (Freedman, S.J.), which gathered cases holding that "some plausible nexus linking the other suspect to the crime" must exist before nondisclosure of police investigative records regarding an alternative suspect can rise to the level of a *Brady* violation. An analysis of those same cases suggests that a "plausible nexus" exists in this case, at least to the extent Lopez's claims regarding Garcia are true.

First, an examination of the leading Supreme Court case where no "substantial nexus" existed suggests that Lopez's case is distinguishable. In *Moore*, the Supreme Court held that there was no *Brady* violation when the undisclosed information regarding another suspect was an early lead, later abandoned when eyewitnesses established that he had been mistakenly identified. 408 U.S. at 795, 92 S.Ct. 2562. Assuming for the moment that *Moore* is still good law,[6] it is distinguishable from this case. There were strong positive identifications of the defendant as the murderer, and the alternate suspect, "Slick," was a person who, at a later date, boasted about having engaged in similar conduct. *Id.* at 788–93, 92 S.Ct. 2562. Although the prosecution failed to disclose evidence that some witnesses did not think "Slick" and the defendant were the same person, a clear demonstration that they were differ-

ent people would neither have exonerated the defendant nor in any way have suggested that "Slick" was the real culprit. *Id.* at 795–97, 92 S.Ct. 2562 (concluding the evidence was "not material to the issue of guilt"). Here, Lopez provides evidence that Garcia had method, opportunity, and motive, in a case where the murderer's identity could only be established through circumstantial evidence.

Second, Lopez's case is roughly as strong as many cases where a "substantial nexus" has been found, to the extent that the Court credits his claims regarding Garcia. For example, in *Smith v. Secretary of New Mexico Dept. of Corrections*, 50 F.3d 801, 829–30 (10th Cir.1995), a police report was held to be material for *Brady* purposes when it revealed that an alternative homicide suspect was "near the vicinity of the bodies on two separate occasions" and that bloody women's clothes were found in his truck during a traffic stop. Garcia was likewise seen in the vicinity where the victim's body was found on occasions shortly before and after the victim was killed, and his relationships with Lopez, Rodriguez, and her sister constitute additional probative evidence that Garcia might have been the killer, just as the bloody clothes in *Smith* provided additional evidence. Similarly, in *Bowen v. Maynard*, 799 F.2d 593, 612–13 (10th Cir. 1986), a *Brady* violation was found when prosecutors failed to reveal evidence relating to an alternative suspect who was linked to organized crime and had more motive than the defendant. Although in this instance Lopez (taking state court findings as true) had a stronger motive than that alleged for Garcia, Garcia has, like the *Bowen* suspect, an extensive rele-

---

6. The law in this area has become more defendant-friendly since *Moore* was decided. *Moore* required a specific request from the defense for a *Brady* violation to occur, 408 U.S. at 794–95, 92 S.Ct. 2562, whereas under

*Bagley*, the defense need not make any request to trigger a prosecutor's affirmative duty to disclose exculpatory evidence, 473 U.S. at 682, 105 S.Ct. 3375.

vant criminal history and was twice placed near the crime scene, whereas the *Bowen* suspect was never placed near the crime scene.[7] *United States v. Stifel, II,* 594 F.Supp. 1525, 1541 (N.D.Ohio 1984), held that "the defendant should have been apprised of evidence showing that someone other than himself had equal motive, access to [bomb-making] materials, and other surrounding circumstances implicating him as the guilty party." Garcia similarly had motive (although perhaps not "equal"), opportunity, and surrounding circumstances (namely, the relationship with the Rodriguezes and Lopez, and sightings near the crime scene). *See also Jamison v. Collins,* 100 F.Supp.2d 647, 692 (S.D.Ohio 2000) (finding a *Brady* violation where undisclosed eyewitness statements gave a physical description of the perpetrator that differed substantially from defendant's physical appearance).

In order to obtain habeas relief for a *Brady* violation here, Lopez must establish that the state courts were "objectively unreasonable" in determining that the Haverhill police's information on Garcia was not material (the SJC was presumably applying the *Brady* analysis, *see Lopez,* 433 Mass. at 415, 742 N.E.2d 1067). This inquiry is most appropriately considered as whether the SJC reached a decision that was an "unreasonable application of" clearly established federal law, although it arguably could be "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]." The level of objective unreasonableness required is essentially the same in either inquiry. *See Torres v. Prunty,* 223 F.3d 1103, 1107–08 (9th Cir. 2000).

The SJC stated that there was no "adequately supportable basis in the record" either for Lopez's contentions that the information that Kojak and Garcia were the same person was not previously available, or that Lopez was prejudiced by any failure of the Commonwealth to disclose what the police knew about Kojak's identity. It is not entirely clear what the SJC meant, as it provides no further explanation, and the Commonwealth has not discussed this passage in its brief. The SJC could mean that there is insufficient evidence: (1) that the police had any information about Kojak; (2) that the police failed to disclose any information about Kojak; or (3) that any information the police had about Kojak was undiscoverable by other means. The SJC might also simply have been assigning another level of significance to its conclusion that the information about Garcia was not relevant to the case—if the evidence was not material, then there could be no prejudice. If the SJC meant one of the first two, either finding would be clearly erroneous. Testimony by Roche and members of the Haverhill Police Department and affidavits submitted with Lopez's motion for a new trial indicate that the police had information about Kojak that was not disclosed to Lopez, and there is no evidence to the contrary. Likewise, the Court effectively addresses the fourth interpretation below by establishing that the undisclosed information could well be material if Lopez's contentions about Garcia are true.

The SJC may have meant, then, that Lopez had not provided sufficient evidence that he could not, through reasonable diligence, have acquired substantially the same information that the police possessed about Kojak. As such, because Lopez

---

7. In *Mendez v. Artuz,* No. 98 Civ. 2652, 2000 WL 722613, at *13 (S.D.N.Y. June 6, 2000), the court concluded there was a *Brady* violation where the undisclosed suspect had equal opportunity and stronger motive than the defendant.

should have discovered this information on his own, the Commonwealth's failure to disclose did not prejudice his case. If the SJC meant this, it presents a more difficult question. Lopez has alleged that his attorney "interviewed Roche before his testimony, but had no opportunity to conduct any investigation into the facts observed and disclosed for the first time by this surprise witness." Pet.'s Mem. at 7. Lopez's counsel had much with which to deal at the time, given the destruction of evidence and the late disclosure of Diaz. In light of Lopez's claim of limited opportunity to investigate, the special difficulties he confronted as he approached trial, and the absence of any evidence that Lopez could have discovered Kojak's true identity before trial, this Court would hold that Lopez had established the possibility of prejudice, were it ruling on the matter in the first instance. The mere fact that this Court disagrees with the SJC's findings, however, does not make them clearly erroneous. A reasonable jurist could find that Lopez had enough information to connect the dots without any further disclosure by the Commonwealth.

Given the ambiguous and cursory nature of this passage in the SJC's opinion, the Court cannot interpret it to establish a lack of prejudice. Rather, the Court holds that the Commonwealth's failure to disclose what the police knew about Garcia prevented Lopez from fully presenting an alternative suspect. If Lopez can establish a reasonable probability that full presentation would have led to a failure in confidence in the verdict, then he is eligible for habeas relief.

If what Lopez claims about Garcia is true, it would be objectively unreasonable to suggest that there was no "reasonable probability" that a full exploration of Garcia's potential role in the murder could

have undermined confidence in the verdict, even assuming that the SJC's findings with regard to the record evidence in the trial were correct.

The case against Lopez was based entirely on circumstantial evidence. If Lopez's claims about Garcia are true, the circumstantial evidence pointing to Garcia as the murderer is significant, and a presentation of all the facts about him might undermine confidence in the verdict. It is undisputed that Garcia has a substantial and violent criminal history. According to Lopez, Garcia was the victim's mother's drug dealer and was romantically involved with the victim's maternal aunt. It may well be that, in addition to his alleged vendetta against Lopez, he had other motives for murder arising out of those relationships. He was seen near the crime scene shortly before and shortly after the murder (on which occasion he was also near the victim's house), suggesting an opportunity to commit the murder, and was involved in an "automotive business," suggesting possible familiarity with the salvage yard and the equipment there.

The trial judge reached his decision on Lopez's motion for a new trial without holding a hearing. In post-conviction proceedings in Massachusetts state courts, it is within the judge's discretion to rule on the issues presented "on the basis of the facts alleged in the affidavits without further hearing if no substantial issue is raised by the motion or affidavits." Mass. R.Crim. P. 30(c)(3).[8]

It is unclear whether the trial judge was holding that a full exploration of Garcia's potential role in the murder would not likely have undermined the verdict, or that Lopez's affidavits, standing alone, were unlikely to impact the verdict. The SJC

---

8. The judge may also authorize discovery. Mass. R.Crim. P. 30(c)(4).

appears to have taken this latter approach, stating that "[t]he only evidence directly connecting Garcia to the defendant, or to the Rodriguez family, came in the defendant's own self-serving affidavit. The usefulness of this information is highly questionable; the defendant did not testify at trial, and his claim that Garcia threatened revenge against him is impermissible hearsay." *Lopez*, 433 Mass. at 416, 742 N.E.2d 1067. The SJC continued: "Merely introducing another possible suspect, without substantial admissible evidence that this person, and not the defendant, may have committed the crimes, does not warrant a new trial. . . . The little additional and generalized information contained in the defendant's affidavits casts no real doubt on the validity of the jury's verdicts." *Id.* (footnote omitted).

It appears, then, that the state courts' conclusions were based on the probative value of Lopez's affidavits, rather than on the significance that his claims might have if they were true. This Court, however, respectfully disagrees with this approach. Were Lopez to have a new trial, he would be able to examine Garcia and cross-examine Rodriguez and her sister, and possibly others, regarding all the claims in his affidavits. The reason that Lopez could only base his new trial motion on his affidavits was that he was not given any kind of evidentiary hearing, at which he could use compulsory process to elicit testimony from witnesses with personal knowledge. Nor was he given any opportunity to conduct discovery. Without compulsory process, Lopez could not be expected to get, for example, supporting affidavits from the victim's mother and aunt, and from the man he wishes to accuse of committing the murder.

If Lopez can demonstrate to this Court that he can provide more compelling evidence supporting his claims about Garcia,

then he would likely be eligible for habeas relief. The question is whether this Court has any power to grant Lopez an evidentiary hearing, after appropriate discovery and with compulsory process.

## C. Standards for an Evidentiary Hearing

■ In determining whether to grant Lopez an evidentiary hearing, the Court must begin with 28 U.S.C. § 2254(e)(2), which provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

If Lopez was subject to the terms of this provision, he would not be eligible for an evidentiary hearing. There is sufficient evidence of his guilt such that, even if he established all his allegations regarding Garcia, a reasonable fact finder could still find Lopez guilty under section 2254(e)(2)(B). Fortunately for Lopez, his claim is not governed by this provision.

Section 2254(e)(2) only applies to an applicant who "has failed to develop the factual basis of a claim in State court proceedings." Lopez has in fact developed

the factual basis of his claim in state court—he presented the state courts with affidavits laying out the relevant facts. Even were the Court to hold that the other evidence that Lopez would want to present in a new trial—such as testimony by Rodriguez, her sister, and Garcia—was not presented to the state courts, it cannot be said that Lopez "failed" to present such evidence. "Failure" in this context requires some lack of diligence, *Williams v. Taylor*, 529 U.S. 420, 430, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000),[9] and Lopez did everything reasonably possible to get the relevant facts before the state courts. He therefore falls outside the restrictions of section 2254(e)(2). *See id.* at 437, 120 S.Ct. 1479 ("If there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements.").

▇▇▇▇ This means that the Court must make its determination based on pre-AEDPA law governing evidentiary hearings, or other relevant sources. In particular, *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), as modified by *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992),[10] provides the relevant standard. Under *Townsend:*

> Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.

*Martineau v. Perrin*, 601 F.2d 1201, 1207 (1st Cir.1979) (citing *Townsend*, 372 U.S. at 312–13, 83 S.Ct. 745). *Townsend* mandates a hearing

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313, 83 S.Ct. 745. "In all other cases . . ., the holding of such a hearing is in the discretion of the district judge." *Id.* at 318, 83 S.Ct. 745; *accord* Rule 8(a), Rules Governing Section 2254 Cases; *Lonchar v. Thomas*, 517 U.S. 314, 326, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1997).

Lopez has never had a full and fair hearing to demonstrate whether he can corroborate his claims regarding Garcia. It is unlikely that he could ever obtain corroborating evidence without discovery and compulsory process. The "fact-find-

---

9. The Supreme Court decided two cases titled *Williams v. Taylor* in 2000, involving different petitioners, the other one of which, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)(discussed *supra*), addressed the proper interpretation of 28 U.S.C. § 2254(d).

10. *Keeney* overruled *Townsend* to the extent that the latter called for a "deliberate bypass" standard for excusing procedural default in state courts, rather than a "cause and prejudice" standard. *Keeney*, 504 U.S. at 5–6, 112 S.Ct. 1715. That distinction is not relevant here.

ing procedure employed by the state court was not adequate" in this particular case, given the unique difficulties Lopez faced and the fact that there was "a substantial allegation of newly discovered evidence." *Townsend,* 372 U.S. at 313, 83 S.Ct. 745.

Lopez thus meets the *Townsend* standard. Even if he did not, the Court would, in the exercise of its discretion, hold an evidentiary hearing, given the substantial nature of the claims raised. The Court emphasizes, however, that it does not fault the procedures employed in the courts of the Commonwealth generally; rather, on the facts of this particular case, more is needed to ensure fulfillment of the commitment to justice that the Commonwealth and the federal government both share.

## III. CONCLUSION

The Court therefore orders that Lopez submit a proposed timeline for the hearing and any discovery within four weeks from the date of this order. If he does not wish to have an evidentiary hearing, then he must so inform the Court within that time. The Commonwealth shall have two weeks thereafter to respond. Obviously, it would be preferable if Lopez and the Commonwealth could agree on the schedule and simply file a joint submission. Although Lopez "is not entitled to discovery as a matter of ordinary course," *Bracy v. Gramley,* 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997), discovery may well be appropriate in this case, and Lopez may make an appropriate request under Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts. *See Bracy,* 520 U.S. at 904, 117 S.Ct. 1793. The hearing and any related discovery shall focus solely on facts surrounding Garcia and his possible role in the murder, and on facts surrounding the government's

possession and handling of information relating to Garcia.

SO ORDERED.